# EXHIBIT A

```
 1              IN THE GENERAL SESSIONS COURT
 2             FOR HAMILTON COUNTY, TENNESSEE
 3
 4   STATE OF TENNESSEE,
 5        Plaintiff,
 6
 7   vs                          C. A. No. 307686
 8
 9   ANTHONY NATHAN SMITH
10   and WILLIAM HOWARD,
11        Defendants.
12
13
14
15           TRANSCRIPT OF PRELIMINARY HEARING
16          Before The Honorable Gary W. Starnes
17
18
19
20
21   APPEARANCES:
22   For Plaintiff:        BRIAN BUSH, ESQ.
23   For Defendant Howard: ADAM S. MAJOR, ESQ.
24   For Defendant Smith:  JOHNNY MAHLUHM, ESQ.
25
```

Barringer Court Reporting
P.O. Box 8035, Gray, TN - 423-477-7844

| | | |
|---|---|---|
| 1 | TABLE OF CONTENTS | PAGE |
| 2 | STYLE PAGE | 1 |
| 3 | TABLE OF CONTENTS | 2 |
| 4 | OFFICER COLE STEVENS: | |
| 5 |   Direct Examination by Mr. Bush | 4-21 |
| 6 |   Cross Examination by Mr. Major | 21-34 |
| 7 |   Redirect Examination by Mr. Bush | 34-36 |
| 8 |   Cross Examination by Mr. Mahluhm | 36-44 |
| 9 |   Redirect Examination by Mr. Bush | 44-45 |
| 10 | DEPUTY ANDREW VOSS: | |
| 11 |   Direct Examination by Mr. Bush | 46-58 |
| 12 |   Cross Examination by Mr. Major | 58-65 |
| 13 |   Cross Examination by Mr. Mahluhm | 65-68 |
| 14 |   Examination by Mr. ___ | 69-70 |
| 15 | COURT'S RULING | 70 |
| 16 | CERTIFICATE | 71 |
| 17 | | |
| 18 | | |
| 19 | | |
| 20 | | |
| 21 | | |
| 22 | | |
| 23 | | |
| 24 | | |
| 25 | | |

1    not.
2         Q.   Okay.  Is your encounter with Howard
3    captured at all by way of video?  In other words, any
4    video in your vehicle that would have captured -- a
5    recording of your encounter with Mr. Howard?
6         A.   We did turn on video after the initial
7    contact.
8         Q.   Okay.  But you have no video of him
9    passing you and you coming back to the Wendy's?
10        A.   No.
11        Q.   Okay.  But you did turn it on whenever
12   you had the initial encounter with Mr. Howard?
13        A.   Not on the initial encounter.
14        Q.   Okay.
15        A.   I didn't have enough time to turn...
16        Q.   Okay.  But as you're parked in the
17   Wendy's parking lot, that's being recorded.  Is that
18   right?  Is there an audio recording or a video
19   recording?
20        A.   Not on the initial contact.
21        Q.   All right.  Why don't you just tell me
22   what was recorded?  That makes it easier.  What was
23   recorded to your knowledge?
24        A.   I mean we'd have to look at the video.
25   I don't know everything that got recorded.

```
 1         Q.   All right.  But you know at some point
 2   a camera was turned on and something was captured on
 3   that camera?
 4         A.   Yes.
 5         Q.   Okay.  All right.  And you'll preserve
 6   that during the pendency of this case?
 7         A.   Yes.
 8         Q.   While this case is pending, you'll
 9   preserve that.  Is that right?
10         A.   I believe it's on Deputy Voss'
11   vehicle.
12         Q.   Okay.  All right.  At what point did
13   Deputy Voss join you?
14         A.   Immediately.
15         Q.   Okay.  All right.  Did you radio him
16   in advance for him to get there, or was it just by
17   coincidence he arrived on the scene at the same time?
18         A.   No.  I called him via phone.
19         Q.   All right.  And where did he position
20   his vehicle?
21         A.   The passenger's side of my vehicle.
22         Q.   Okay.  Had Voss already arrived on the
23   scene by the time you -- before you approached the
24   driver's side of the vehicle?
25         A.   We approached the vehicle together.
```

```
1    you Mirandized Mr. Howard.  Is that right, Deputy?
2           A.   I did not Mirandize him.
3           Q.   Okay.  Was that Voss?
4           A.   I believe so.
5           Q.   Okay.  Any admissions that you heard
6    Mr. Howard make with respect to the ownership of any
7    of the items that were found on him or anything else
8    inside the vehicle?
9           A.   I did not.
10          Q.   Okay.  I believe that's all the
11   questions I have.
12
13          REDIRECT EXAMINATION BY MR. BUSH:
14
15          Q.   Just a few, quick follow-ups.  Mr.
16   Major was asking you about what would involve
17   (inaudible) there or not.  Is it true that he
18   accompanied you to the Wendy's parking lot?
19          A.   Yes.
20          Q.   So you were working in tandem?
21          A.   Yes.
22          Q.   All right.  Let's talk about the
23   equipment just briefly.  You are -- your squad car is
24   equipped with video equipment, recording equipment.
25   Correct?
```

1    A. Yes.

2    Q. And that can be manually activated or
3    automatically activated. Is that correct?

4    A. Yes.

5    Q. Okay. I think a sample of when it's
6    automatically activated is if you activate your blue
7    lights. Correct?

8    A. Yes.

9    Q. And as an example, when it's manually
10   activated is when you don't have your blue lights on
11   but you want to record what's happening?

12   A. You push the button.

13   Q. All right. Your audio -- you don't
14   have a body cam. Correct?

15   A. I do not.

16   Q. But you do have -- you have audio
17   recording equipment on your person.

18   A. Yes.

19   Q. When does that come on automatically?

20   A. When the video recorder comes on.

21   Q. So if your blue lights are on or if
22   you manually turn on your equipment, your audio
23   automatically comes on?

24   A. Yes.

25   Q. Do you have the ability to manually

```
 1    turn on your recording equipment?
 2         A.   Yes.
 3         Q.   And from when you parked your car and
 4    got out with the suspects to when the equipment
 5    started recording, had your vehicle moved at all?
 6         A.   Ask me one more time.
 7         Q.   All right.  So where you parked - all
 8    right? - you got out, and it's your testimony that
 9    nothing was being recorded.
10         A.   Right.
11         Q.   When your recording equipment
12    eventually comes back on, had your vehicle remained
13    in the same spot the entire time?
14         A.   Yes.
15         Q.   All right.  And their vehicle had
16    remained in the same spot the entire time?
17         A.   Yes.
18         Q.   All right.  That's all I have.
19              THE COURT:  Anything further?  Mr.
20    Mahluhm, do you have anything?
21              MR. MAHLUHM:  Yes, Your Honor.
22
23              CROSS EXAMINATION BY MR. JOHNNY MAHLUHM:
24
25         Q.   Thank you.  Good morning, Deputy
```

1  Q.  ...and the sex toy as well.  And
2  inside there you found the meth.  Is that right?
3  A.  That's correct.
4  Q.  Anything else in the bag in terms of
5  any ID or anything, any item -- let's start with IDs.
6  A.  Not that I recall, no.
7  Q.  Okay.  Were there any initials on the
8  backpack or anything like that, anything identifying
9  about the backpack itself?
10  A.  Not that I recall.
11  Q.  Okay.  Can you describe just the
12  condition of the contents of the vehicle?  A lot of
13  things in there, a few things?  How would you
14  describe it?
15  A.  It was packed full of clothes and
16  junk.
17  Q.  Okay.  Aside from the meth that you
18  found inside the black bag and aside from what was
19  found of Mr. Howard's, any other meth found inside
20  the vehicle?
21  A.  Not that I recall.
22  Q.  Okay.  Any other marijuana besides
23  what was found on Mr. Howard?
24  A.  Not that I recall.
25  Q.  Okay.  And, again, to make sure that I

```
 1   understood you, in terms of the video recording, are
 2   you saying the video would have started recording
 3   after the defendants were placed in handcuffs?
 4          A.   Yes.
 5          Q.   Okay.  And only afterwards?  It
 6   wouldn't have captured anything beforehand?
 7          A.   Like I said, I haven't reviewed it.  I
 8   may have very well hit it...my memory, but I doubt
 9   it.
10          Q.   Okay.  At some point did you or Deputy
11   Stevens draw guns on the occupants of the vehicle?
12          A.   Absolutely.
13          Q.   And why was that?
14          A.   Because he wasn't following commands,
15   and we thought he had a gun.
16          Q.   Okay.  By "he," you mean Mr. Howard?
17          A.   The driver.  Mr. Smith was absolutely
18   cooperative at all times.
19          Q.   Okay.  Obviously, no firearms were
20   found inside the vehicle.
21          A.   No, Sir.
22          Q.   Is that correct?  Okay.  Any other
23   statements Mr. Howard made there at the scene other
24   than the fact that he was from Virginia and had only
25   been in town for a few minutes?
```

A.    When we started searching the vehicle,
he started stating that he couldn't give me
permission to search the vehicle because it wasn't
his vehicle.
         Q.    Okay.  Did he identify the owner of
the vehicle?
         A.    No.
         Q.    Or his connection with the owner of
the vehicle...
         A.    Not that I remember.
         Q.    ...or how he came to be in the
vehicle?
         A.    Not that I remember.
         Q.    Okay.  Anything else stated by Mr.
Howard to the best of your recollection of these
events?
         A.    When I asked him about the
methamphetamine after he was Mirandized, he tried to
explain to me that he came down from Virginia and
somebody had left the methamphetamine in the car, and
I tried to explain to him that that was about
$30,000.00 worth of amphetamine.  People just don't
leave that.  That was the only thing I really recall.
         Q.    Did you volunteer to him that you
suspected it to be meth or did he say that it was

Barringer Court Reporting
P.O. Box 8035, Gray, TN - 423-477-7844
62

Case 2:19-cr-00096-JRG-CRW   Document 330   Filed 06/19/20   Page 11 of 14   PageID #: 637

```
 1   meth?
 2         A.   I couldn't recall that.
 3         Q.   Okay.  Where was Mr. Howard whenever
 4   you discovered the bag in the back and you opened it
 5   up?
 6         A.   He was leaning on the front of Deputy
 7   Stevens' vehicle.
 8         Q.   Okay.  Did he claim ownership of
 9   anything in the bag at all?
10         A.   No.  They -- nobody knew anything.
11         Q.   Okay.  All right.  When you get back
12   to the station -- was it field tested at all in terms
13   of the suspected substance?
14         A.   No.
15         Q.   When you get back to the station, it's
16   weighed, and you're present while it was being
17   weighed.  I assume we're talking about a digital
18   scale that it was placed upon?
19         A.   That's correct.  It was in our
20   Property Division.
21         Q.   All right.  What was actually placed
22   on the scale itself?
23         A.   The bag and the plastic bag.
24         Q.   Okay.  So we're talking about two
25   plastic -- in other words, it sounds like these are
```

Barringer Court Reporting
P.O. Box 8035, Gray, TN - 423-477-7844
63
Case 2:19-cr-00096-JRG-CRW   Document 330   Filed 06/19/20   Page 12 of 14   PageID #: 638

```
 1    packaged separately?  In other words, you had two...
 2            A.   Yeah.  I weighed it and how I weighed
 3    it is each bag separately, and then obviously I added
 4    the two.
 5            Q.   And each one weighed 2.33 pounds?
 6            A.   Correct.
 7            Q.   Okay.  What did the packaging of the
 8    meth itself look like?  In other words, was there
 9    color to it, or was it just a clear bag?
10            A.   It was a freezer bag.  Just like a
11    black freezer bag.
12            Q.   Okay.  What happened to the vehicle?
13            A.   We towed it, the next wrecker, so it's
14    -- I don't recall which wrecker yard, but it's
15    somewhere in the records.
16            Q.   But it's still I assume locally here
17    in Hamilton County?
18            A.   Absolutely.
19            Q.   Okay.  Have you been able to talk to
20    any owners of the vehicle?
21            A.   No.
22            Q.   Okay.  Have you reached out to them
23    since this...
24            A.   No.
25            Q.   ...matter began?  Okay.  Your Honor,
```

Barringer Court Reporting
P.O. Box 8035, Gray, TN - 423-477-7844
64

Case 2:19-cr-00096-JRG-CRW   Document 330   Filed 06/19/20   Page 13 of 14   PageID #: 639

```
 1    that's all the questions I have for Deputy Voss.
 2              MR. BUSH:  No redirect, Your Honor.
 3              THE COURT:  Any questions of this witness?
 4              MR. MAHLUHM:  Yes, Your Honor.  Thank you.
 5
 6              CROSS EXAMINATION BY MR. JOHNNY MAHLUHM:
 7
 8         Q.   Good morning, Deputy Voss.  My name is
 9    John Mahluhm, and I represent Mr. Smith.
10         A.   All right.
11         Q.   You did take a statement from Mr.
12    Smith, though.  Is that correct?
13         A.   It was a vague statement.  I basically
14    -- he didn't really want to talk.  So I'm not going
15    to force him to cooperate.  So...
16         Q.   He said he didn't know anything
17    about...
18         A.   That's correct.
19         Q.   ...the meth found in the car?
20         A.   That's correct.
21         Q.   And there's a video of that or...
22         A.   Most likely.
23         Q.   And the District Attorney asked you if
24    you've made arrests prior to this for a controlled
25    substance, which was confirmed to be a controlled
```