UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
GREENEVILLE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | 2:19-CR-96 |
| ) | |
| vs. ) | |
| ) | |
| ANTHONY NATHAN SMITH, ) | |
| ) | |
| Defendant ) | |

**REPORT AND RECOMMENDATION AS TO DEFENDANT'S FIRST AND SECOND MOTIONS TO SUPPRESS EVIDENCE AND FIRST AND SECOND MOTIONS TO DISMISS COUNT SIX OF THE INDICTMENT**

Before the Court are Defendant's First and Second Motions to Suppress Evidence Obtained in Violation of the United States Constitution [Docs. 327 & 338] and Defendant's First and Second Motions to Dismiss Count Six of the Indictment Because of the Destruction by Law Enforcement Officers of Critical Evidence Violating the Defendant's Right to Due Process. [Docs. 329 & 336]. The United States filed Responses in Opposition [Docs. 388-89, 397] to these motions. The Court conducted evidentiary hearings on Defendant's motions on August 27, 2020 and September 9, 2020. Present at the hearings were Defendant and his counsel, Jerry Laughlin, Esq., along with Assistant United States Attorneys Emily Swecker, Esq. and Thomas McCauley, Esq. Testifying at the hearings were Deputy Cole Stevens and Deputy Andrew Voss of the Hamilton County, Tennessee Sheriff's Office and Detective Aaron Hankins with the Bristol Police Department in Bristol, Virginia.

This matter is before the Court pursuant to 28 U.S.C. § 636(b) and the standing orders of the District Court for a Report and Recommendation. For the reasons stated herein, the undersigned **RECOMMENDS** that the Motions to Suppress [Doc. 327 & 338] and the Motions to Dismiss Counts Six of the Indictment [Docs. 329 & 336] be **DENIED**.

## I. PROCEDURAL BACKGROUND

On July 9, 2019, a federal grand jury returned an indictment against Defendant charging him with one count of knowingly, intentionally, and without authority combining, conspiring, confederating and agreeing with other persons to distribute 50 grams or more of methamphetamine, its salts, isomers, and salts of its isomers, a Schedule II controlled substance in violation of 21 U.S.C. §§ 846, 841(b)(1)(A); and one count of knowingly, intentionally, and without authority, aided and abetted by others, possessing with intent to distribute fifty (50) grams or more of methamphetamine, its salts, isomers, and salts of its isomers, a Schedule II controlled substance in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A) and 18 U.S.C. § 2 and *Pinkerton v. United States*, 328 U.S. 640 (1946) (*Pinkerton* liability). These charges arose out of incidents which occurred on October 9, 2018 and February 7, 2019.

Defendant's first suppression motion addresses issues related to the February 7, 2019 stop and search of a vehicle in which he was a passenger that took place in Hamilton County, Tennessee. His first motion to dismiss arises from the government's failure to produce the audio and video recordings of this stop and search created by a dashboard camera and the body microphone worn by one of the law enforcement officers involved in the stop. The second motion to dismiss addresses two issues: officers' failure to preserve the Acura automobile in

which Defendant was a passenger and their failure to retain a backpack and remaining contents located in that automobile, from which officers removed methamphetamine.

Defendant's second suppression motion arises out of an October 9, 2018 stop and search of Defendant by Bristol, Virginia police officers. Defendant takes the position that the warrantless search of his backpack during the stop violated his Fourth Amendment rights and as a result the evidence located within the backpack, i.e. methamphetamine, should be suppressed.

## II. FINDINGS OF FACT

### a. Testimony of Deputy Cole Stevens- February 7, 2019 stop

Deputy Cole Stevens ("Deputy Stevens") an eight-year veteran of the Hamilton County Sheriff's Office ("HCSO") testified that on February 7, 2019, he was asked by his partner, Deputy Andrew Voss ("Deputy Voss"), to assist with a narcotics investigation in East Ridge, Tennessee. Deputy Stevens proceeded to East Ridge and he and other officers involved in the matter used a private "talk around" channel to exchange information about the ongoing investigation. Specifically, Deputy Stevens learned that a blue Acura was potentially involved in drug activity.[1] Officer Stevens parked his patrol car on the side of Ringgold Road in East Ridge, and at approximately 8:50 p.m. he observed a blue Acura drive by. He testified that there was an abrupt change in the driver's behavior as he passed the police car, with the driver

---

[1] During the hearing, Deputy Stevens was questioned by Defendant's counsel about the difference in his testimony before this Court and the Hamilton County General Sessions Court. He admitted testifying in the Hamilton County General Sessions Court that he had not been instructed to be on the lookout for the blue Acura prior to pulling behind the vehicle in the Wendy's parking lot. While this difference and other aspects of Deputy Stevens' testimony make it clear to the Court that Deputy Stevens was not fully candid, his testimony was not so lacking in credibility as to disregard it.

stiffening his arms and leaning back in his seat. After pulling out to follow the vehicle, Deputy Stevens took down the license plate information and when he observed the vehicle abruptly pull into a Wendy's parking lot, he pulled into a separate parking lot to run the tag.

Deputy Stevens stated the Acura was registered to male and female owners, and the male owner's Tennessee driver's license was revoked because of a DUI. Deputy Stevens testified the driver matched the description of the male registered owner of the vehicle but admitted he was unable to recall what the description of the owner was or what the driver of the vehicle looked like other than they were both white males. Deputy Stevens was also unable to remember whether it was dark at the time he first observed the driver of the Acura, despite it being approximately 9:00 p.m. in February, but the proof did show he first observed the Acura in a well-lit area. Deputy Stevens also could not recall the speed at which the vehicle was traveling when he made his initial observation.[2]

Once Deputy Stevens determined the male registered owner of the Acura had a suspended driver's license and matched the description of his observation of the driver, he advised Deputy Voss that he was going to Wendy's where the Acura was located. Upon entering the Wendy's parking lot, Deputy Stevens pulled in behind the Acura and saw the car's occupants begin moving erratically inside the vehicle. Deputy Stevens exited his vehicle and approached the driver's side of the Acura, observing a pipe, consistent with the type used to smoke methamphetamine, and a lighter in plain view in the front seat of the car. Deputy Stevens also

---

[2] The proof demonstrated that the driver of the Acura was not actually the male owner of the vehicle; however, the proof produced at the hearing was insufficient to allow the Court to determine whether there were meaningful differences between the features of the driver and the male owner that would undermine Deputy Stevens' testimony that the driver matched the male owner's description. Task Force Officer Thompson, also with the HCSO was in the Wendy's parking lot before Deputy Stevens arrived and observed the driver enter the restaurant, providing him with an opportunity to observe the driver's features; however, Deputy Stevens could not remember whether he had that information prior to approaching the Acura.

observed the driver attempting to push the pipe into the floorboard. Deputy Stevens then instructed the driver of the vehicle, a co-defendant in this case, to exit the vehicle, but he did not comply. After multiple requests, the driver ultimately exited but was still noncompliant. By this time, Deputy Voss had arrived on the scene and was placing Defendant in handcuffs; however, Deputy Stevens noted Defendant was cooperative. Once Deputy Voss had Defendant handcuffed, he came around the vehicle to assist Deputy Stevens with restraining the driver. Deputy Stevens testified that during a search of the driver, officers found methamphetamine and marijuana, but a search of Defendant's person yielded no illegal substances.

Deputy Stevens also testified that while he did not observe it himself, Deputy Voss told him that when conducting an inventory search of the vehicle, he found "two big bags" of methamphetamine in a backpack. Deputy Stevens also stated that there were no audio or video recordings of the stop or search captured by his equipment because his emergency lights were never activated which is what automatically activates the recording equipment. He explained that he did not take time to activate his lights because once he observed the occupants of the Acura moving around erratically, he needed to exit his vehicle immediately for his safety.

### b. Testimony of Deputy Andrew Voss- February 7, 2019 stop

The testimony of Deputy Voss, a fifteen-year veteran of the HCSO, confirmed that he and Deputy Stevens had been on a "talk around" channel with several other officers sharing information about a drug investigation on February 7, 2019. He stated that his part in the operation began about 2:00 p.m. that day when he received a call from Task Force Officer Thompson, also with the HCSO, asking if he could assist with the possible stop of a vehicle coming from Atlanta suspected of being involved in a drug transaction. Originally, Deputy Voss

was advised to be on the lookout for a Honda Civic but the Civic had an encounter with a blue Acura and the blue Acura then became the target vehicle.

After Deputy Stevens notified him that he was headed to the Wendy's parking lot where the blue Acura was located, Deputy Voss headed to the scene, ultimately parking behind Deputy Stevens' police car. Deputy Voss testified that as he approached the Acura, he smelled methamphetamine at the rear of the vehicle. He observed the driver with a lighter and a Wendy's Frosty and noticed the driver was not following Deputy Stevens' commands. Deputy Voss made contact with Defendant, who was in the passenger seat of the Acura, and instructed him to exit the vehicle. Deputy Voss stated Defendant was compliant, and he placed Defendant in handcuffs and advised Defendant that he was not under arrest but was being detained until the situation was safe. Deputy Voss then assisted Deputy Stevens in restraining the driver, which involved the driver being taken to the ground. At that point Deputy Voss realized there was no video or audio recording on, so he activated his recording equipment.

After the recording was activated, Deputy Voss returned to the Acura and conducted an inventory search of the vehicle. He located a white backpack in the back seat of the car that contained 4.6 pounds of methamphetamine along with various personal items, none of which indicated the identity of the backpack's owner. Deputy Voss stated that the interior of the vehicle was a "mess" and full of miscellaneous junk and clothes. He determined that none of the items other than the methamphetamine had evidentiary value and replaced them in the vehicle. The Acura was then towed in accordance with routine practice.

Deputy Voss explained the video system in use by HCSO at the time operated by initially storing the recordings on an internal hard drive within the vehicle and officers routinely "uploaded" these videos to the IT servers located at headquarters. Deputy Voss testified there

was no way to delete videos from the hard drives in their police vehicles and while he does not have a specific memory of uploading this video, he believes he did so in accordance with his normal activities. Deputy Voss never watched the video.

### c. Testimony of Detective Aaron Hankins- October 9, 2018 stop

Detective Aaron Hankins ("Detective Hankins") of the Bristol Police Department ("BPD") testified that at about 2:45 p.m. on October 9, 2018 Defendant was riding his motorcycle in Bristol, Virginia when Detective Hankins stopped him for speeding. Detective Hankins stated that he observed Defendant pull from a residential driveway and quickly accelerate until he was travelling at approximately 70 miles per hour in a 25 mile per hour zone. Defendant's counsel questioned how Defendant could have been traveling that fast when Defendant would have come to at least three stop signs between the point where Detective Hankins observed him leave the private driveway and where he pulled him over, but Detective Hankins could not say whether Defendant actually stopped at these stop signs. Counsel further questioned the accuracy of Detective Hankins testimony regarding speed because he didn't use radar to determine Defendant's speed. Detective Hankins explained that he was able to determine Defendant's speed because he had been trained on speed estimation while attending the police academy.

After Detective Hankins caught up to Defendant's motorcycle a couple of streets over, he activated his lights and siren and Defendant stopped. Detective Hankins stated he smelled a strong odor of marijuana as he approached Defendant, which Defendant tried to explain away by stating that the source of the smell must have been the two people he had passed who were smoking marijuana on their porch. Detective Hankins then had Defendant get off his motorcycle and take off the backpack he was wearing so he could pat him down for weapons as a safety

precaution. Detective Hankins found a large amount of cash on Defendant's person but no illegal items or weapons. Detective Hankins then asked Defendant if he had anything illegal in his backpack, and Defendant stated he had a set of scales but refused to consent to a search of the backpack.

By that time other officers had responded to the scene. Detective Hankins testified he searched the backpack based on the smell of marijuana and found approximately 40 grams of methamphetamine inside but no marijuana. Defendant was then placed under arrest but was not cited for speeding. Detective Hankins testified that if Defendant had not been speeding, he would not have stopped him, but he did not intend to write Defendant a ticket when he pulled him over for speeding. He stated that if he had not smelled marijuana on Defendant, he would have given him a warning to slow down and let him go.

Detective Hankins also testified that there were no audio or video recordings of the stop because his police vehicle is not equipped with a camera and BPD detectives do not wear body cameras. After being arrested, Defendant was transported to the jail by a patrol unit, and a wrecker was called to tow Defendant's motorcycle. Detective Hankins stated that after Defendant was transported, he was not questioned but Defendant voluntarily apologized for the trouble he had caused and said the methamphetamine found belonged to him and was for his personal use.

### III. ANALYSIS

#### a. First Motion to Suppress- February 7, 2019 Stop

Defendant argues there was no probable cause for a traffic stop or reasonable suspicion of criminal activity to support the stop of the Acura resulting in an unconstitutional seizure [Doc. 328, p. 3]. Consequently, Defendant asserts that any evidence discovered during the search of the vehicle must be suppressed as fruit of the poisonous tree. *Id.* at p. 2-3. The government

alleges Deputy Stevens' reasonable belief the driver of the vehicle was the registered owner who had a revoked driver's license formed sufficient probable cause for the traffic stop [Doc. 388, p. 2]. Additionally, the United States argues officers were also receiving information from an ongoing Title III wiretap about the vehicle being involved in a drug transaction. *Id.*

"As a general matter, the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred." *Whren v. United States*, 517 U.S. 806, 810 (1996). Tennessee Code Annotated § 55-12-131 establishes that it is a Class B misdemeanor under state law for a person to drive while their license is cancelled, suspended, or revoked. In *Kansas v. Glover*, 140 S. Ct. 1183 (2020) the United States Supreme Court confronted the issue of whether a police officer violates the Fourth Amendment by initiating a traffic stop after running a vehicle's license plate and learning that the registered owner is revoked. The Supreme Court held that when an officer "lacks information negating an inference that the owner is the driver of the vehicle, the stop is reasonable." *Id.* at 1186. Once a vehicle has been legally stopped, a warrantless search of the vehicle is constitutional if based on probable cause. *Carroll v. United States*, 276 U.S. 132, 154 (1925). The scope of this search extends to all containers inside the vehicle where contraband may be concealed. *United States v. Ross*, 456 U.S. 798, 822 (1982). More specifically, "[i]f the police have probable cause to search a lawfully stopped vehicle for contraband, then the police have probable cause to search every part of the vehicle and all containers found therein in which the object of the search could be hidden." *United States v. Stubblefield*, 682 F.3d 502, 507 (6th Cir. 2012).

Here, the evidence before the Court demonstrates that law enforcement had probable cause to believe that a traffic violation was being committed by the driver of the vehicle. The

registered owner of the vehicle had a revoked Tennessee driver's license and driving on a revoked license is undoubtedly in violation of the law. Although Defendant has attempted to question the credibility of Deputy Stevens' claim that the driver of the vehicle matched the description of the registered owner, no evidence to the contrary has been introduced. Moreover, at least one of Defendant's arguments for why this could not have been the case, that it was too dark for Deputy Stevens to clearly see the driver, was nullified by Officer Voss' description of the area where Deputy Stevens observed the Acura drive by as well-lit with street lights in addition to light from numerous businesses and signs along the street. Absent any contrary evidence, the Court has no reason to doubt Deputy Stevens' explanation for stopping the vehicle which clearly amounts to probable cause.

Turning to the reasonableness of the search of the vehicle, Deputy Stevens testified he observed drug paraphernalia in plain view immediately upon approaching the vehicle in addition to observing the erratic movements of the occupants when he parked behind the Acura. Additionally, Deputy Voss testified to smelling the odor of methamphetamine on his approach to the car. The Sixth Circuit has consistently held that the odor of drugs in a vehicle alone is sufficient probable cause to search the vehicle. *United States v. Terrell*, 483 F. App'x 161, 165 (6th Cir. 2012) (citing *United States v. Foster,* 376 F.3d 577, 583–84 (6th Cir.2004); *United States v. Garza,* 10 F.3d 1241, 1246 (6th Cir.1993)). As such, the smell of narcotics combined with the observance of paraphernalia and suspicious behavior of the vehicle occupants provided officers with probable cause to search the vehicle and its contents.

Neither the initial stop of the vehicle or the subsequent search was conducted unconstitutionally. Therefore, there is no grounds for evidence seized during the search to be suppressed.

### b. Motions to Dismiss Count Six of Indictment Due to Destruction of Evidence

Defendant contends that Count Six of the Indictment against him should be dismissed because the government failed to preserve audio and video recordings of the February 7, 2019 stop by HCSO officers which led to the charge. In addressing the issue, the Court notes that due process does not require "an undifferentiated and absolute duty to retain and to preserve all material that might be of conceivable evidentiary significance in a particular prosecution." *Arizona v. Youngblood*, 488 U.S. 51, 58 (1988). Any absolute duty to preserve evidence is limited to evidence that is constitutionally material to the defense. *California v. Trombetta*, 467 U.S. 479, 487-89 (1984). To meet this standard, the evidence must have exculpatory value that was apparent before it was destroyed and be of such a nature that the defendant is unable to obtain comparable evidence by other reasonably available means. *Id.* at 489. Where the evidence in question does not meet the standard of constitutional materiality, "unless a criminal defendant can [also] show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law." *Youngblood*, 488 U.S. at 58; *see also United States v. Collins*, 799 F.3d 554, 569 (6th Cir. 2015); *United States v. Jobson*, 102 F.3d 214, 218 (6th Cir. 1996). "Negligence, even gross negligence, on the part of the government does not constitute bad faith." *United States v. Spalding*, 438 Fed. App'x 464, 466 (6th Cir. 2011) (citing *United States v. Wright*, 260 F.3d 568, 571 (6th Cir. 2001)). To establish bad faith, a defendant must show "official animus or a conscious effort to suppress exculpatory evidence." *United States v. Jobson*, 102 F.3d 214, 218 (6th Cir. 1996) (quoting *Trombetta*, 467 U.S. at 488) (internal quotation marks omitted).

### 1. Destruction of the Audio and Video Recordings

Defendant argues that the significance of the audio and video recordings of any portion of the events related to the stop, search, and arrest of Defendant should have been apparent on the date of the arrest and that their significance was further emphasized during the preliminary hearing in Hamilton County General Sessions Court. [Doc. 331, p. 2]. Defendant also alleges that because the recordings would be evidence of violation(s) of his constitutional rights, law enforcement acted in bad faith in destroying or otherwise failing to preserve these recordings. *Id.*

The United States responds that the destruction of these recordings was the result of a server crash caused by a technical failure and not attributable to the officers involved in this case. [Doc. 389, p. 6]. The government argues that there was no targeted effort to destroy evidence in Defendant's case and there is no evidence of animus or conscious effort to destroy recordings by the HCSO. *Id.* The government also filed a Statement by Hamilton County Sheriff's Office Regarding Arbitrator Server Crash [Doc. 453] as a supplement to its response to Defendant's Motion.[3] This statement explains that a network technician discovered the Arbitrator video server was running unusually slow on January 10, 2020 and made several attempts to resolve the issues with the server. When the server could not be repaired, third-party data recovery was attempted but was unsuccessful. Further, the United States alleges the recordings would "merely show the vehicle, the defendant and codefendant, and the search of the vehicle," and does not concede these recordings had any apparent exculpatory value. [Doc. 389, p. 7].

---

[3] This statement was previously filed in a different criminal case in the Eastern District of Tennessee Chattanooga Division and was filed after the evidentiary hearing on Defendant's motion at the Court's request.

The Court must first determine whether the lost recordings are constitutionally material or potentially useful evidence. Constitutionally material evidence is evidence which has exculpatory value that was apparent before it was destroyed and of such a nature that the defendant is unable to obtain comparable evidence by other reasonably available means. *Trombetta*, 467 U.S. at 489. The United States admits that it is unlikely that Defendant would be able to reasonably obtain comparable evidence [Doc. 389, p. 7]. Given that there are no other audio or video recordings of the stop or search, the Court agrees that the nature of the evidence is such that Defendant is unable to obtain comparable evidence by any other reasonably available means; however, the exculpatory value prong of the materiality test is not so easily satisfied in the current case.

While Defendant alleges that the "significance" of these recordings should have been apparent as soon as they were made, Defendant provides no reason for why officers would have known this evidence was *exculpatory*. Deputy Voss' testimony before the Hamilton County General Sessions Court was that no recording began until after Defendant and the driver of the Acura were in handcuffs, just as he testified before this Court. [Doc. 330, p. 10]. Defendant does not explain what exculpatory evidence the recordings would have been expected to contain considering how late in the stop they were commenced, except to say that they would have shown he denied having knowledge of the backpack containing methamphetamine, a fact Deputy Voss readily admitted during the preliminary hearing held in this matter. [Doc. 330, p. 14].

Additionally, there is no proof that the officers, or anyone, ever watched or listened to the recordings before they were lost during the server crash. While the Court is not stating that the recordings would have been useless to Defendant, there is no evidence that they were

necessarily exculpatory or that the officers would have been aware of such exculpatory value. As such, the evidence does not satisfy the test for constitutional materiality.

Because the recordings are evidence that may have been useful to Defendant but not constitutionally material, the Court must determine whether there was any bad faith on the part of law enforcement in the loss or destruction of the evidence. Deputy Voss testified that while he had no specific recollection of uploading the recordings at issue, he always followed standard procedures in uploading recordings to the HCSO servers and the Court has no reason to doubt his testimony. Still, the issue of bad faith must be closely scrutinized in this matter for two reasons. First, it is very troubling that the HCSO did not take the necessary steps to ensure that such important evidence was secure by properly backing it up. While the Court acknowledges the budgetary constraints faced by the HCSO which are referenced in its filing, that does not fully excuse the circumstances leading to the loss of the recordings at issue. Of equally great concern is the fact that the initial discovery deadline in this matter was in November 2019. Had the recordings been timely provided to Defendant's counsel in this action, the evidence would not have been lost in the server crash, which did not occur until January 2020. Additionally, Deputy Stevens specifically committed to preserving this evidence during the preliminary hearing in the Hamilton County General Sessions Court. [Doc. 330, p. 5]. At the same time, the Court observes that Defendant was aware of these recordings soon after his arrest on February 7, 2019; yet, he did not take steps to secure a copy at that time of what he now claims to be vitally important exculpatory evidence.[4]

---

[4] While portions of the preliminary hearing transcript were filed as an Exhibit in this cause, the transcript does not set forth the date on which the preliminary hearing took place, but it would be expected to have occurred soon after charges were brought against Defendant in state court.

On balance, while the Court finds the government's failure to preserve and timely provide the recordings at issue rises to the level of gross negligence, the Court does not find that there is the necessary animus or conscious effort to destroy evidence which would entitle Defendant to the dismissal of Count Six of the indictment. If the only recordings lost due to the server malfunction were those in Defendant's case the argument for bad faith would be stronger, but in this instance a large-scale technical malfunction resulted in the loss of numerous recordings related to a wide range of investigations and prosecutions. While it is indeed a close call, the Court cannot conclude that the loss of these recordings was the result of bad faith.

### 2. Failure to Preserve Automobile, Backpack, and their Contents

Defendant argues that because methamphetamine was found on the driver's person and in a backpack in the backseat of the Acura in which he was merely a passenger, but not on his own person, the significance of the vehicle and its contents as well as the backpack and items it contained besides the methamphetamine was readily apparent. [Doc. 336, p. 4]. Defendant further alleges that had these items been preserved they could have been tested for fingerprints and DNA evidence which would have demonstrated that the items did not belong to him. [Doc. 336, pp. 2-3]. Additionally, he contends that if the backseat was in such a condition that had he been permitted to photograph it, the photograph would have demonstrated how he could have been unaware that the white backpack was there because of the other items in the backseat. [Doc. 336, p.3]. Defendant further asserts that law enforcement officers were acting in bad faith because there is no potential good faith reason as to why they would not have preserved the car, backpack and contents because they could exonerate him. [Doc. 337, p. 4].

The United States responds with respect to the vehicle by stating that officers acted in accordance with their customary practice in having the Acura towed from the scene at the

conclusion of the search and arrest. [Doc. 389, p. 8]. Regarding the backpack and its contents, the government asserts the officers acted reasonably in seizing and preserving the methamphetamine found inside the backpack and there is nothing to suggest that a failure to preserve the backpack or other contents was the result of animus or deliberate effort to destroy evidence. The government also argues that there was no apparent exculpatory value to the backpack and contents as Defendant was located inside the vehicle with the illegal substance and officers had no reason to believe that any forensic evidence found on or inside the backpack would be exculpatory because establishing that Defendant was the owner of the backpack was unnecessary under the theory of constructive possession. *Id.*

As with the recordings, the automobile, backpack, and their contents are unique pieces of evidence and the United States concedes that Defendant is unable to obtain comparable evidence [Doc. 389, p. 9]. While the Court would note that preserving the backpack and its content and photographing the backseat and backpack in the condition in which it was originally found would have been prudent and much preferred, as with the recordings, these items of evidence are not constitutionally material as their exculpatory value was not apparent prior to their destruction. Although the vehicle did not belong to Defendant and the back seat contained numerous items besides the backpack, officers had no reason to believe that the vehicle itself or any of the other items it contained would prove Defendant was innocent of the allegation of possessing methamphetamine, especially when the government may obtain a conviction against Defendant by merely proving constructive possession.[5] The same can be said of the backpack itself and its contents. Due to the lack of clear exculpatory value, this evidence also cannot be

---

[5] "Constructive possession exists when a person does not have possession but instead knowingly has the power and the intention at a given time to exercise dominion and control over an object, either directly or through others." *United States v. Gardner*, 488 F.3d 700, 713 (6th Cir. 2007).

considered constitutionally material and the Court must consider whether officers acted in bad faith in failing to preserve this evidence.

As pointed out by the government, officers followed normal procedure in having the vehicle towed from the scene by a private towing company once the arrest had been made, which does not suggest bad faith. Additionally, while Defendant asserts that having the opportunity to photograph the backseat of the Acura and its content would have demonstrated that he could easily have been unaware of the white backpack, Deputy Voss has already provided clear testimony that the entire rear of the vehicle "was a mess" and filled with miscellaneous junk and clothes. Deputy Voss did testify that the backpack was on top, but the backpack would already have been moved before Defendant could have photographed it even if the vehicle was preserved.

Additionally, Deputy Voss specifically testified that he did not believe the backpack or remaining content had evidentiary value and that he did not believe it would have been possible to obtain fingerprints from the backpack. While once again officers could have, and should have handled this matter differently, under the standard set forth in *Trombetta* and *Youngblood,* the failure to preserve the vehicle and backpack with its remaining content does not rise to the level of animus or deliberate effort to destroy evidence which would warrant dismissal of Count Six of the Indictment.

   c. **Second Motion to Suppress- October 9, 2018 Stop**

During the hearing on Defendant's motion, his counsel first attempted to call into question Detective Hankins' version of events supporting the stop; however, Defendant takes the position that even if Detective Hankins had grounds to stop Defendant, he did not have a basis for a warrantless search of Defendant's backpack. Defendant avers that there is no specifically

Case 2:19-cr-00096-JRG-CRW   Document 510   Filed 10/19/20   Page 17 of 20
PageID #: 1721

established and well delineated exception to the warrant requirement of the Fourth Amendment which applies; therefore, the search of his backpack is per se unreasonable and the evidence discovered as a result must be suppressed [Doc. 339, p. 1]. The United States responds by asserting that although Defendant was on a motorcycle instead of in a car, this was still a traffic stop and the vehicle exception to the search warrant requirement applies and extends to all containers that are functionally equivalent to being "inside" the vehicle [Doc. 397, pp. 2-4].

As previously stated, probable cause to believe a traffic violation has been committed is justification for a traffic stop and a legally stopped vehicle may be subjected to a thorough warrantless search upon probable cause that it contains contraband. *Whren*, 517 U.S. at 810; *Carroll*, 276 U.S. at 154; *Ross*, 456 U.S. at 822. The Sixth Circuit has consistently held that the odor of drugs in a vehicle alone is sufficient probable cause to search a vehicle. *United States v. Terrell*, 483 F. App'x 161, 165 (6th Cir. 2012) (citing *United States v. Foster,* 376 F.3d 577, 583–84 (6th Cir.2004); *United States v. Garza,* 10 F.3d 1241, 1246 (6th Cir.1993)). The Supreme Court has routinely acknowledged that the core basis for the automobile exception to the warrant requirement is the inherently mobile character of a vehicle and, more recently, the pervasive regulation of vehicles travelling on public roadways. *Collins v. Virginia*, 138 S. Ct. 1663, 1669-70 (2018). Because motorcycles are similar in character to automobiles, the Court has held that they are also subject to the automobile exception. *Id.*

While Defendant attempted to call into question whether Detective Hankins had probable cause for the stop, the detective testified that he had observed Defendant leave a private driveway and quickly accelerate to a high rate of speed of approximately 70 miles per hour in a 25 mile per hour zone. Although Detective Hankins did not utilize radar to determine Defendant's speed, he testified that he had been trained to estimate speed without a radar device while attending the

police academy. Even if Detective Hankins was not fully accurate in his estimation of Defendant's speed, the Court finds his testimony that Defendant was speeding to be credible; therefore, he had grounds to initiate a traffic stop.

With grounds having been established for the stop, the Court turns to whether Detective Hankins had a constitutional basis to search Defendant's backpack without a warrant. Detective Hankins testified that he smelled a strong odor of marijuana when he approached Defendant, which under clearly established law provided him with probable cause to search under the automobile exception to the warrant requirement. While Defendant suggests that because no marijuana or weapons were located on his person and the backpack was not within Defendant's reach by the time it was searched a warrantless search was impermissible, the Court does not find legal support for this position.

Once Detective Hankins smelled a strong odor of marijuana on Defendant, he had probable cause to believe Defendant's backpack contained incriminating evidence. At that point, the automobile exception permitted a search that was just as broad as a magistrate could have authorized in a warrant. *Ross,* 456 U.S. at 823. Such a search extends to all containers in which suspected contraband, in this case illegal drugs, could be hidden. *Stubblefield*, 682 F.3d at 507. A backpack like Defendant's qualifies as such a container, a fact confirmed when Detective Hankins located illegal drugs in it, even if not the type he expected. As the stop and search of Defendant were proper and supported by probable cause, the evidence discovered as a result should not be suppressed.

## IV. CONCLUSION

For the reasons outlined above, the undersigned **RECOMMENDS** that Defendant's First and Second Motions to Suppress [Docs. 327 and 338] and First and Second Motions to Dismiss Count Six of the Indictment [Docs. 329 and 336] be **DENIED**. [6]

Respectfully Submitted,

/s Cynthia Richardson Wyrick
United States Magistrate Judge

---

[6] Any objections to this report and recommendation must be served and filed within **fourteen (14) days** after service of a copy of this recommended disposition on the objecting party. Fed. R. Crim. P. 59(b)(2). Failure to file objections within the time specified waives the right to review by the District Court. Fed. R. Crim. P. 59(b)(2); *see United States v. Branch*, 537 F.3d 582 (6th. Cir. 2008); *see also Thomas v. Arn*, 474 U.S. 140, 155 (1985) (providing that failure to file objections in compliance with the time period waives the right to appeal the District Court's order). The District Court need not provide *de novo* review where objections to this report and recommendation are frivolous, conclusive, or general. *Mira v. Marshall*, 806 F.2d 636, 637 (6th Cir. 1986). Only specific objections are reserved for appellate review. *Smith v. Detroit Federation of Teachers*, 829 F.2d 1370, 1373 (6th Cir. 1987).